UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| SHEILA PRATT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:10-cv-438 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claim for disability insurance benefits (DIB).  On February 7, 2007, plaintiff filed her application for benefits alleging a January 22, 2002 onset of disability.  (A.R. 129-31).  Plaintiff's disability insured status expired on June 30, 2007.  Thus, it was plaintiff's burden to submit evidence demonstrating that she was disabled on or before June 30, 2007.  *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Plaintiff's claim was denied on initial review.  (A.R. 79-91).  On June 12, 2009, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel.  (A.R. 35-72).   On August 19, 2009, the ALJ issued a decision finding that plaintiff was not disabled.  (A.R. 16-27).  On March 12, 2010, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision denying her claim for DIB benefits.  Plaintiff argues that the Commissioner's decision should be overturned on the following grounds:

1.  The ALJ's hypothetical question to the VE "failed to incorporate the mental limitations found by the ALJ himself[;]"

2.  "The records reviewer's RFCA was insubstantial, where contradicted by all other evidence in the case[;]" and

3.  "The ALJ mischaracterized the record, cherry-picked the record, and failed to identify any inconsistency that would have justified rejecting plaintiff's testimony[.]"

(Statement of Errors, Plf. Brief at 2, docket # 7).  Upon review, I find that the issues raised by plaintiff do not provide grounds for disturbing the Commissioner's decision.  I recommend that the Commissioner's decision be affirmed.

## **Standard of Review**

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.  *See Ulman v. Commissioner*, No. 11-2304, __ F.3d __, 2012 WL 3871353, at * 4 (6th Cir. Sept. 7, 2012); *Walters*

*v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996) ("[E]ven if the district court -- had it been in the position of the ALJ -- would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from January 22, 2002, through June 30, 2007, but not thereafter. (A.R. 18). Plaintiff had not engaged in substantial gainful activity on or after January 22, 2002. (A.R. 18). Through her date last disability insured, plaintiff had the following severe impairments: "degenerative disc

disease of the cervical spine (status post-fusion), chronic right shoulder and arm pain, and personality

disorder (not otherwise specified)." (A.R. 18).  Plaintiff did not have an impairment or combination

of impairments which met or equaled the requirements of the listing of impairments.  (A.R. 19).

The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of

light work, involving simple, repetitive tasks:[1]

> After careful consideration of the entire record, the undersigned finds that through the date
> last insured, the claimant had the residual functional capacity to perform less than a full range
> of light work (20 C.F.R. 404.1567(b)).  She was able to lift and/or carry 20 pounds
> occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) about six
> hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour
> workday but allowing for periodic alternate sitting and standing, if needed, of approximately
> 1 to 2 minutes every hour; do no work involving use of the right upper extremity and only
> do left-handed work; do no constant pushing and/or pulling of the lower extremities; never
> climb ladders, ropes and scaffolds; and occasionally climb ramps and stairs, balance, stoop,
> kneel, crouch, and crawl.  She needed to avoid concentrated exposure to vibration concerning
> the right upper extremity and to workplace hazards such as moving machinery and
> unprotected heights.

(A.R. 21).  The ALJ found that plaintiff's testimony regarding her subjective limitations was not

fully credible.  (A.R. 21-25).  Plaintiff was unable to perform her past relevant work:

> The vocational expert testified that the claimant had past relevant work as a material handler
> (heavy, semiskilled both as the claimant had performed the work and as usually performed),
> hi-lo operator (medium, semiskilled both as claimant performed the work and as usually
> performed), and bank teller (medium, semiskilled as the claimant performed the work and
> light, semiskilled as the work is generally performed).  In view of the claimant's residual
> functional capacity, the undersigned finds that the claimant is unable to perform any past
> relevant work through the date last disability insured.

(A.R. 25).  Plaintiff was 48-years-old as of her date last disability insured.  Thus, at all times relevant

to her claim for DIB benefits, plaintiff was classified as a younger individual.  (A.R. 25).  Plaintiff

---

[1]The ALJ's factual finding limiting plaintiff to simple, repetitive tasks is found on page 10
of his opinion: "[T]he claimant is determined to mentally have had the capacity to perform work
involving simple, repetitive tasks on and prior to June 30, 2007."  (A.R. 25).

has a high school education and is able to communicate in English.  (A.R. 25).  The transferability

of job skills was not material to a determination of disability.  (A.R. 25).  The ALJ then turned to the

testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of

plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were

more than 8,400 jobs in the State of Michigan that the hypothetical person would be capable of

performing.  (A.R. 63-71).  The ALJ held that this constituted a significant number of jobs.  Using

Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was

not disabled.  (A.R. 26-27).

### 1.

Plaintiff argues that the ALJ's hypothetical question to the VE "failed to incorporate

mental limitations found by the ALJ."  (Plf. Brief at 5).  She argues:  (a) that the ALJ's RFC finding

"omits any mental limitations;" and (b) that the hypothetical question posed to the VE failed to

include a "moderate" limitation in concentration.  (*Id.* at 5-6).

A.     RFC Finding

Plaintiff's argument that the ALJ's RFC finding "omit[ted] any mental limitation"

is meritless.  The ALJ found that plaintiff's mental impairments limited her to performing simple,

repetitive tasks:

> The claimant complained of depression at the hearing.  She alleged that she had no social
> limitations but was not sure that she could focus for simple, repetitive tasks.  As mentioned
> above, a consulting psychologist also determined in March 2006, that the claimant's GAF
> was 70, which indicated only mild symptoms with adequate functioning and meaningful
> interpersonal relationships (Exhibit 32F)[A.R. 504-07].

The claimant has not had any extensive psychological or psychiatric treatment.  She has acknowledged that she has not required counseling.  Dr. Basch reported that Lexapro has been an effective medicine for the claimant from a mood stabilization standpoint (Exhibit 39F/5)[A.R. 583].

In June 2007, a [S]tate agency medical consultant concluded that the claimant did not have any mental impairment which was severe (Exhibit 43F)[A.R. 602-15].  In April 2006, however, a State agency medical consultant had assessed that the claimant retained the capacity to perform simple tasks on a sustained basis (Exhibit 35F)[A.R. 524-28].  In view of the medical evidence establishing the existence of a significantly limiting depressive disorder, the undersigned finds that the assessment in Exhibit 35F represents a more appropriate determination of the claimant's mental functioning on and prior to her date last insured.  The undersigned therefore adopts the finding of the State agency medical consultant in Exhibit 35F.  *Accordingly, the claimant is determined to mentally have had the capacity to perform work involving simple, repetitive tasks on and prior to June 30, 2007.*

(A.R. 24-25) (emphasis added).  The ALJ's failure to repeat this finding in paragraph five of his opinion (A.R. 21) was a trivial oversight.[2]  It is not a basis for overturning the Commissioner's decision.

RFC is the most, not the least, a claimant can do despite her impairments.  20 C.F.R. § 404.1545(a); *see Kornecky v. Commissioner*, 167 F. App'x 496, 499 (6th Cir. 2006).  RFC is an administrative finding of fact reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(2); *see Deaton v. Commissioner*, 315 F. App'x 595, 598 (6th Cir. 2009).  "In formulating a residual functional capacity, the ALJ evaluates all the relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions."  *Eslinger v.*

---

[2]Harmless error analysis applies.  *See Ulman v. Commissioner*, No. 11-2304, __ F.3d __, 2012 WL 3871353, at * 4 (6th Cir. Sept. 7, 2012); *Potter v. Commissioner*, 223 F. App'x 458, 463-64 (6th Cir. 2007); *see also Wilson v. Commissioner*, 280 F. App'x 456, 460-61 (6th Cir. 2008); *Griffeth v. Commissioner*, 217 F. App'x 425, 428-29 (6th Cir. 2007); *accord Kornecky v. Commissioner*, 167 F. App'x 496, 507 (6th Cir. 2006) ("No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.") (quoting *Fisher v. Bowen*, 869 F.3d 1055, 1057 (7th Cir. 1989)).

*Commissioner*, No. 10-3820, 2012 WL 616661, at * 2 (6th Cir. Feb. 27, 2012).  I find that the ALJ's

factual finding that plaintiff retained the RFC to perform simple, repetitive work as of her date last

disability insured is supported by more than substantial evidence.

B.     Step 3 of the Sequential Analysis

           Plaintiff argues that the hypothetical question the ALJ posed to the VE was deficient

because it did not include a "moderate" limitation in concentration:

> The simple fact is that the VE was never asked how many jobs are available to one whose "severe" personality disorder causes "moderate" limitations in concentration.  Consequently, there is no opinion as to the numbers of jobs available to one as limited *as the ALJ found Plaintiff to be.*

(Plf. Brief at 6).  Plaintiff's argument is meritless.  She conflates the ALJ's findings at distinct stages

of the sequential analysis, ignores the ALJ's credibility determination, and disregards the more

carefully calibrated nature of the ALJ's factual finding regarding her RFC.

           The administrative finding whether a claimant meets or equals a listed impairment

is made at step 3 of the sequential analysis.[3]   *See* 20 C.F.R. § 404.1520(a)(4)(iii).   Step-3 regulates

a "narrow category of adjudicatory conduct."  *Combs v. Commissioner*, 459 F.3d 640, 649 (6th Cir.

---

[3]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act."  *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  Under the sequential analysis, "The claimant must first show that she is not engaged in substantial gainful activity.  Next, the claimant must demonstrate that she has a 'severe impairment.'  A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and 'meets or equals a listed impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past.  Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work."  *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

2006) (*en banc*).  It "governs the organization and evaluation of proof of listed impairments that, if supported, renders entitlement to benefits a foregone conclusion."  *Id.*  "Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the [Social Security Administration's] SSA's special list of impairments, or that is at least equal in severity to those listed.  The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity.  A person with such an impairment or an equivalent, consequently, necessarily satisfies that statutory definition of disability."  *Id.* at 643 (internal citations omitted).  It is well established that a claimant has the burden of demonstrating that she satisfies all the individual requirements of a listing.  *See Elam*, 348 F.3d at 125.  "If all the requirements of the listing are not present, the claimant does not satisfy that listing."  *Berry v. Commissioner*, 34 F. App'x 202, 203 (6th Cir. 2002).  "It is insufficient that a claimant comes close to satisfying the requirements of a listed impairment."  *Elam*, 348 F.3d at 125.  By contrast, the administrative finding of a claimant's RFC is made between steps 3 and 4 of the sequential analysis and it is applied at steps 4 and 5.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity.  We use the residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").

The ALJ determined at step 3 of the sequential analysis that plaintiff's impairments did not meet or equal the requirements of any listed impairment.  (A.R. 19).  Plaintiff's personality disorder did not come close to satisfying the demanding paragraph B severity requirements of listing 12.08:

> The claimant's mental impairment did not meet or medically equal the criteria of listing 12.08.  In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied.  To satisfy the "paragraph B" criteria, the mental impairment must

result in at least two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked restriction means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant had no restriction as a consequence of her mental condition. She testified that she maintains a home life so that she does not feel worthless. She stated that she sews two to three times a week, will do the laundry with her left hand, does simple meal preparation, cleans carpets with a "sticky roller" and hard floors with "wet wipes," and tends to her flower beds and potato plants with her left hand.

In social functioning, the claimant had no difficulties. The claimant lives with her husband in a single-wide mobile home. She relates well with her mother and other family members and attends church services every other month. She testified that she would not have any problem working with others in a job setting.

With regard to concentration, persistence or pace, the claimant had moderate difficulties. The undersigned concludes that the claimant had moderate difficulties partially due to her perception of pain. She is able to handle finances (Exhibit 1E)[A.R. 149-55].

As for episodes of decompensation, the claimant had experienced no episodes of decompensation, which have been of extended duration. The evidence of record does not disclose that the claimant has had any exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. She has not had any significant alteration in medication and has not had a documented need for a more structured psychological support system. Other relevant information does not exist in the record to establish the existence, severity, or duration of an episode of decompensation.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria were not satisfied. Notably, the "paragraph B" criteria determined in this decision are consistent with the conclusions of the State agency medical consultant in Exhibit 34F [A.R. 510-23].

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore,

the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(A.R. 19-20).

Plaintiff is not challenging the ALJ's step-3 finding that she did not meet or equal the requirements of any listed impairment. Rather, she is attempting to take a portion of the ALJ's finding with regard to the paragraph B criteria at step 3 out of context and substitute it for the ALJ's factual finding that she retained the RFC for simple, repetitive work. It is well established that the paragraph B criteria used at steps 2 and 3 of the sequential analysis "are not an RFC assessment." *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96–8p (reprinted at 1996 WL 374184, at * 4 (SSA July 2, 1996)). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorder listings in 12.00 or the Listings of Impairments." *Id.* at 4; *see Tippett v. Commissioner*, No. 3:10-cv-1427, 2011 WL 6014015, at * 12 (D. Or. Dec. 2, 2011); *Reynolds v. Commissioner*, No. 10-110, 2011 WL 3897793, at * 3 (E.D. Mich. Aug. 19, 2011); *Johnson v. Astrue*, No. 3:09-cv-492, 2010 WL 3894098, at * 8 (M.D. Fla. Sept. 30, 2010); *Olatubosun v. Astrue*, No. 8:09cv376, 2010 WL 3724819, at *13 (D. Neb. Sept. 17, 2010). The ALJ's step-3 findings do not undermine his finding that plaintiff retained the RFC for simple, repetitive tasks.

C.    Step 5 of the Sequential Analysis

Plaintiff argues that the ALJ's hypothetical question to the VE was inadequate because it did not take her mental impairment into account. The hearing transcript shows that the

-10-

hypothetical question included the restriction of simple, repetitive work. (A.R. 67). A VE's testimony in response to a hypothetical question accurately reflecting a claimant's impairments provides substantial evidence supporting the Commissioner's decision. *See Varley v. Secretary of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). A hypothetical question is not required to list the claimant's medical conditions, but is only required to reflect the claimant's limitations. *Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004). The ALJ found that plaintiff's testimony was not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated complaints. *See Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *see also Parks v. Social Security Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) ("Hypothetical questions [] need only incorporate those limitations which the ALJ has accepted as credible."); *Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010) ("[I]t is 'well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.'") (quoting *Casey*, 987 F.2d at 1235). I find that the hypothetical question the ALJ posed to the VE was accurate and that the VE's testimony in response provides substantial evidence supporting the ALJ's decision.

## 2.

Plaintiff argues that the ALJ mischaracterized and "cherry picked" the record. (Plf. Brief at 9). This argument is frequently made and seldom successful, because "the same process can be described more neutrally as weighing the evidence." *White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009). The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the

court's judgment for that of the ALJ. *See Ulman v. Commissioner*, 2012 WL 3871353, at * 4; *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). I find that the ALJ did not "mischaracterize" or "cherry pick" this administrative record.

### 3.

Plaintiff argues that the ALJ "failed to identify any inconsistency that would justify rejecting [her] credibility." (Plf. Brief at 9). She quotes an excerpt from 20 C.F.R. § 404.1529(c)(3) and then argues that "[n]one of the reasons given by the ALJ to reject the claimant's testimony constitute the required inconsistency with substantial evidence." (Plf. Brief at 9).

Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). "An ALJ is in the best position to observe witnesses' demeanor and to make an appropriate evaluation of their credibility. Therefore, an ALJ's credibility assessment will not be disturbed absent compelling reason." *Reynolds v. Commissioner*, 424 F. App'x 411, 417 (6th Cir. 2011) (citation omitted). The ALJ is the administrative trier of fact and it is his function to determine credibility issues. *See Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). "An ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Commissioner*, 336 F.3d at 476. The court does not make its own credibility determinations. *See Ulman v. Commissioner*, 2012 WL 3871353, at * 4; *Walters*, 127 F.3d at 528.

Section 404.1529 describes how the Social Security Administration evaluates a claimant's symptoms, including pain. Among other things, the regulation states: "When the medical

signs or laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce your symptoms, such as pain, we must then evaluate the intensity and persistence of your symptoms so that we can determine how your symptoms limit your capacity for work." 20 C.F.R. § 404.1529(c)(1).  The ALJ considers "all the available evidence," including "objective medical evidence" and "other evidence."  20 C.F.R. §§ 404.1529(c)(1), (2), (3). Plaintiff's argument emphasizes only the highlighted portion of subsection (c)(3) regarding consideration of "other evidence":

> (3)  Consideration of other evidence.  Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms.  The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms.  *Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account* as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled.

20 C.F.R. § 404.1529(c)(3).  Subsection (c)(3) specifies that symptoms "will be taken into account *as explained in section (c)(4)*."  20 C.F.R. § 404.1529(c)(3) (emphasis added).  Subsection (c)(4) describes how the ALJ considers all the available evidence and determines which, if any of the claimant's purported functional limitations "can reasonably be accepted as consistent with the objective evidence and other evidence:"

> (4)  *How we determine the extent to which symptoms, such as pain, affect your capacity to perform basic work activities.*  In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section.  We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we

will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled.  We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).

Here, the ALJ found that plaintiff's alleged functional limitations and restrictions

from symptoms were inconsistent with the objective medical evidence and other evidence to the

extent that she claimed a level of restriction greater than that specified in the RFC:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The claimant has had a steady work history.  She reportedly initially injured her shoulder and cervical spine on November 21, 2001 and worked until January 22, 2002.  She has subsequently received worker's compensation payments concerning her injury.

The claimant has complained of limited activities (Exhibits 2E, 5E, 6E, 8E)[A.R. 156-67, 184-93, 198-205].  The treating specialists, however, have never been able to account for the alleged degree [] right upper extremity pain which the claimant has contended limited her.  There is no documentation of radiculopathy or reflex sympathetic dystrophy.  It seems that the claimant primarily has tendinopathy, and it would appear the claimant's alleged symptoms and limitations are out of proportion to the objective findings.

The claimant has been prescribed Tylenol No. 3 for pain and Lexapro for depression (Exhibits l4E, 38F/2)[A.R. 264-67, 577].  She also wears a Lidoderm-Lidocaine patch and uses a cream for pain.  Of interest, on May 12, 2009, the claimant admitted to Dr. Basch that her medications helped with her pain (Exhibit 52F/2)[A.R. 678].

The claimant has alleged that she has stomach problems as a side effect of her medication usage.  The claimant has had ongoing monitoring of her medication usage, and her treating medical sources have altered her medications and dosages as needed.  If she indeed had a

-14-

severe stomach problem as a consequence of her medication usage, her treating doctors would immediately address the problem as they had in the past.  The undersigned concludes, therefore, that the claimant does not have significant medication side effects.

The claimant has alleged that she has difficulty sleeping at night and that sleep medications have not been helpful.  Because of her lack of sleep during the night, she naps every morning and every afternoon.  Her statements about her sleep patterns, nonetheless, are not supported by the medical record or the comments of her treating doctors on or prior to her date last insured.

In June 2004 the claimant's spouse, David Pratt, stated that the claimant woke him up for work, fed the cats, walked for exercise, and tried to do things around the house such as doing the laundry and fixing easy meals.  The witness reported that he had to take over a good deal of the interior and exterior household chores because of the claimant's condition (Exhibit 1E)[A.R. 149-55].

The claimant's spouse's statements support the claimant's testimony and, moreover, are essentially consistent with an ability to do a limited range of light work.  The undersigned finds the witness's statements credible to the extent that they comport with the residual functional capacity finding of this decision.

(A.R. 21-22).  The ALJ's factual findings are supported by more than substantial evidence.  The exaggerated nature of plaintiff's subjective complaints is documented throughout the medical records by her treating and examining physicians.  The objective medical evidence does not support the degree of limitation she claims.   I find that the ALJ correctly applied the law and that his factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

**4.**

Plaintiff argues that the "records reviewer's RFCA was insubstantial, where contradicted by all other evidence in the case." (Plf. Brief at 6).   She argues that the ALJ should have given greater weight to other opinions:  (a) Physical Therapist Brett Ransom's opinion regarding  regarding her RFC; (b) Dr. Grant Hyatt's opinion limiting her to "lifting five pounds[;]" and (c) various statements that she was "unable to work."  (*Id.* at 7-8).

A.    Therapist Ransom

On April 8, 2009, more than 21 months after plaintiff's date last disability insured, Mr. Ransom performed a consultative evaluation and offered his opinion regarding plaintiff's residual functional capacity. (A.R. 669-76). The ALJ was not required to give any weight to Mr. Ransom's opinions. Documents generated after expiration of plaintiff's disability insured status are "minimally probative," and are considered only to the extent that they illuminate a claimant's health before the expiration of her insured status. *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988); *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Mr. Ransom never examined plaintiff during the period at issue. *See Kornecky v. Commissioner*, 167 F. App'x at 506-07. Further, a physical therapist is not an acceptable medical source. 20 C.F.R. §§ 404.1513(a), (d)(1); *see Perschka v. Commissioner*, 411 F. App'x 781, 787 (6th Cir. 2010); *Hash v. Commissioner*, 309 F. App'x 981, 987 (6th Cir. 2009). Mr. Ransom's opinion on the issue of RFC was entitled to no particular weight. 20 C.F.R. § 404.1527(d)(2).

B.    Dr. Hyatt

Plaintiff argues that Dr. Hyatt limited her to lifting five pounds. (Plf. Brief at 7). Dr. Hyatt examined plaintiff on one occasion. (A.R. 691-713). He was not a treating physician. *See Kornecky*, 167 F. App'x at 506-07. Dr. Hyatt recommended that plaintiff limit the use *of her right shoulder* to lifting and carrying three to five pounds, avoiding extensive or repetitive use of her right upper extremity above the mid chest level, and avoiding forceful or repetitive pushing of the right upper extremity. (A.R. 710) (emphasis added). The ALJ imposed a greater restriction on plaintiff's

-16-

use of her right arm: " No work involving use of the right upper extremity." (A.R. 21). The ALJ's adoption of a more restrictive RFC was not error.

C.      Statements that Plaintiff was "Unable to Work"

Plaintiff argues that the ALJ should have adopted the opinions of "treator Habryl," "treator Bizzigotti," "Dr. Basch," and "shoulder surgeon Day" that plaintiff was "unable to work." (Plf. Brief at 7). None of these opinions were entitled to weight, because the issue of disability is reserved to the Commissioner. Further, all the aforementioned statements were made in the context of plaintiff's past relevant work as a warehouse hi-lo driver: work performed at the medium exertional level, which the ALJ found plaintiff was not capable of performing. (A.R. 25).

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. Opinions that plaintiff was "unable to work" were entitled to no weight. 20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").

1.      Louis Habryl, D.O.

Plaintiff argues that on January 24, 2002, "treator Habryl took [her] off even light work. (279)." (Plf. Brief at 7). Plaintiff stated that she had injured herself at work on November 21, 2001, while "un-crating a snowmobile." She last worked on January 22, 2002. Dr. Habryl's January 2002 progress notes reveal that he temporarily kept plaintiff "off work" from her job as a hi-lo driver to allow her to rest her right shoulder:

-17-

PLAN: At this point we are going to change her medications to Medrol Dosepack, Flexeril as an anti-inflammatory, Ambien for sleep and she will utilize Ultram for pain. It has been somewhat effective. We are going to change her PT, both changing the therapist and the method of treatment.

The patient will be rechecked in 2-3 weeks. I feel that during this interval it would be best if she was off work to rest the area and then hopefully I will be able to return her perhaps with some restrictions on the next evaluation.

(A.R. 283).

The ALJ addressed the "off work slips" provided by Dr. Habryl and others. He recognized that these statements were based on plaintiff's past relevant work, not the social security disability standard:

There are quite a number of "off work" slips from treating doctors, including those which suggest that the claimant was to be "off work" indefinitely (Exhibits 37F/6, 7, 12; 46F/2; 47F)[A.R. 544-55, 550, 629, 632-41]. These undoubtedly refer to the claimant's not being able to do her past relevant work, and as will be discussed below, the undersigned concurs. The determination of disability, however, under the Social Security Act is one reserved to the Commissioner and his designees. Moreover, the "off work" slips are not supported by the doctors' own objective findings or other evidence.

(A.R. 23). The ALJ's decision in this regard is well supported and entirely consistent with applicable law.

2. Paul Bizzigotti, M.D.

Plaintiff makes the following argument based on Dr. Bizzigotti's statement that she was "not suited to work:"

On December 5, 2002, treator Bizzigotti specified "no work," a restriction that was continued on subsequent visits and made "indefinite" on March 5, 2003 (544, 545, 550, 553). On April 30, 2003, Dr. Bizzigotti explained, "Mrs. Pratt is not suited to work. I do not see this changing in the future" (541; emphasis in original).

(Plf. Brief at 7). When viewed in context, it is apparent that Dr. Bizzigotti's statement that plaintiff was "not suited to work" was referring to "work" in the context of plaintiff's former job as a hi-lo driver.

The MRI of plaintiff's right shoulder taken on October 20, 2002, indicated a small rotator cuff tear. (A.R. 294). On November 7, 2002, Dr. Bizzigotti stated that plaintiff could participate in work beginning on November 11, 2002, limited to "light duty, left-handed work only with right arm in a sling; no use of right arm whatsoever until surgery." (A.R. 558). On November 25, 2002, Dr. Bizzigotti performed arthroscopic surgery on plaintiff's right shoulder. (A.R. 314-15). On December 5, 2002, Dr. Bizzigotti noted that plaintiff was "doing well at this stage after a recent right shoulder acromioplasty." (A.R. 551). Dr. Bizzigotti's progress notes establish that when he stated that plaintiff was unable to "return to work," it was in the context of returning to her job as a hi-lo driver:

> Patient is not yet suited to return to work. Recheck in six weeks. Hopefully she can return to driving a Hi-Lo at that time.

(*Id.*). On January 9, 2003, plaintiff reported to Dr. Bizzigotti that she continued to experience some shoulder pain. (A.R. 546). He provided plaintiff with an off-work slip for another six weeks: "No work for six weeks. Medical Necessity: right shoulder pain." (A.R. 550). A CT scan taken of plaintiff's right shoulder on January 16, 2003, returned normal results. There was no evidence of fracture or dislocation, no evidence of spur formation, and no scapular abnormality. (A.R. 547). On March 5, 2003, Dr. Bizzigotti was unable to reconcile the pain plaintiff reported with her recent CT scan results. (A.R. 542). On March 5, 2003, he provided an indefinite "off work" slip, citing plaintiff's right shoulder pain. (A.R. 544).

On April 30, 2003, a case manager for plaintiff's employer's worker's compensation insurer wrote to Bizzigotti requesting applicable work restrictions because her employer would not take her back unless she was at "full duty." (A.R. 541). On May 4, 2003, Dr. Bizzigotti gave this terse response: "Mrs. Pratt is not suited to work. I do not see this changing in the future." (A.R. 541). Dr. Bizzigotti's statement that plaintiff was "not suited to work" was entitled to no weight because the issue of disability is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d at 390.

The Sixth Circuit has held that claimants are entitled to receive good reasons for the weight accorded to their treating sources independent of their substantive right to receive disability benefits. *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007). I find that the ALJ complied with this procedural requirement and gave good reasons why Dr Bizzigotti's statement received little weight:

> The undersigned notes particularly that in May 2003, Dr. Bizz[i]gotti stated that the claimant was not suited to work and that he did not see this assessment changing in the future. Upon examination, however, the doctor recorded that the claimant had well maintained internal and external rotation strength. Her deep tendon reflexes were 2+ and her sensation to light touch was intact. There was no instability within her 40 degree arc of shoulder range motion (Exhibits 37F/2-3; 46F)[A.R. 540-41, 629-30]. . . . Because the comments of Dr[]. Bizz[i]gotti . . . are not supported by [his] medical findings, the undersigned does not afford either controlling or significant weight to [his] opinions.

(A.R. 23).

### 3.     Susan Day, M.D.

Plaintiff argues that her shoulder surgeon Dr. Day "took her off work when he saw her on August 16, 2004 (636) and November 17, 2008 (641)." (Plf. Brief at 7). Dr. Day performed surgery to repair plaintiff's right rotator cuff on July 28, 2004. (A.R. 384-85). On August 16, 2004,

she wrote:  "Assuming this patient's history is correct, this is a work-related injury.  The patient is unable to return to work at the present time.  I plan to see the patient in the office in 2 weeks.  Work restrictions will be modified at that time."  (A.R. 636).  Dr. Day imposed temporary post-surgical restrictions in the context of plaintiff's former employment.

The medical record shows that Dr. Day observed on multiple occasions that plaintiff's pain complaints were out of proportion to her shoulder problem and that the symptoms she reported were bizarre.  (A.R. 404-05, 408-09).  Dr. Day referred plaintiff to Sam Ho, M.D., of Rehabilitation & Physical Medicine Specialists.  On November 4, 2004, Dr. Ho examined plaintiff.  Plaintiff's presentation was "very histrionic."  Dr. Ho agreed with Dr. Day's finding that plaintiff's pain complaints were disproportionate.  (A.R. 399-401).  On May 19, 2005, Dr. Day noted that plaintiff's EMG "revealed no evidence of a nerve problem or compressive pathology."  (A.R. 403).

Plaintiff returned to Dr. Day on January 25, 2007.  Dr. Day recommended a repeat of the right shoulder arthroscopy "to go in and look at the rotator cuff and see if it is firmly attached." (A.R. 578).  On June 30, 2007, plaintiff's disability insured status expired.

On October 24, 2007, Dr. Day performed the right shoulder arthroscopy.  It revealed "minimal signs of degenerative change including changes in the joint.  The labrum appeared intact." A tear in the rotator cuff was repaired.  (A.R. 664-66).  On January 17, 2008, Dr. Day provided a note stating that plaintiff was seen for a work-related problem and that she should perform "no work until [her] next appointment in 6 weeks."  (A.R. 641).  Again, this was a temporary post-surgical restriction.

On February 26, 2008, Dr. Day found that plaintiff had a good passive range of motion in her right arm.  She wrote, "I think at this point, given her symptoms, which I do not have a great anatomical explanation for, we should go ahead and get an EMG test."  (A.R. 662).

On March 12, 2009, plaintiff returned to Dr. Day.  (A.R. 653).  The ALJ summarized the results of this examination as follows:

> Dr. Day reported on March 12, 2009 that the claimant had no overhead movement and had decreased sensation.  The doctor's plan of treatment was to continue pain management with Dr. Basch.  Dr. Day also deferred consideration for permanent restrictions until the claimant had a functional capacity evaluation in April 2009 (Exhibit 50F/2)[A.R. 653].  One cannot extrapolate that Dr. Day found the claimant to be 'totally disabled' since the claimant's alleged onset date based upon the doctor's March 12, 2009 report.

(A.R. 23).  The ALJ's opinion was exceptionally thorough.  I find no error.

4.      Thomas Basch, M.D.

Plaintiff argues that Dr. Basch opined that she "'was completely incapacitated from employment' from [June 23, 2005,] through July 11, 2007."  (Plf. Brief at 7).  The ALJ found that plaintiff's attorney's characterization of Dr. Basch's opinion could not withstand scrutiny:

> The record reveals that in December 2006 and February 2007 Dr. Basch, a specialist with Michigan Pain Consultants, deferred any opinion regarding disability.  The doctor said that the claimant had right shoulder arthritis and tendonitis of a complex presentation.  He noted that she achieved excellent relief with repeated shoulder joint injections.  The doctor recommended that the claimant seek an orthopedic evaluation and that she continue her pendulum and wall crawling exercises.  (Exhibit 39F/2-3)[A.R. 581-82].  It cannot be said that Dr. Basch 'totally disabled' the claimant through her date last insured.

(A.R. 23).  The ALJ's finding that Dr. Basch did not offer an opinion that plaintiff was totally disabled for the period at issue is accurate,[4] and even if he had offered such an opinion, it would not

_____

[4]Dr. Basch provided plaintiff with "off-work" slips indicating that her injury was job-related and that she was completely disabled from her job as a hi-lo driver from June 23, 2005 through July 11, 2007.  (A.R. 637-40).

have been entitled to any weight, because the issue of disability is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1).

On June 23, 2005, Dr. Basch began treating plaintiff on a referral from Dr. Day. Plaintiff complained of right shoulder pain. (A.R. 480-91). Dr. Basch treated plaintiff with nerve block injections, Lidoderm patches, and a brief prescription for Tylenol with codeine. (A.R. 476-79). The MRI of plaintiff's thoracic spine taken on November 8, 2005, revealed mild degenerative changes with no stenosis or disc herniation. (A.R. 495). Her cervical spine MRI showed minimal foraminal narrowing to the left of midline at C3-C4 level. There was no cental stenosis and no recurrent disc herniation. (A.R. 493-94).

On March 20, 2006, Dr. Basch noted that plaintiff's physical condition could not explain the right shoulder pain she reported. (A.R. 592). Dr. Basch treated plaintiff with injections in June, July, August, September, and October 2006. (A.R. 583-91). On September 13, 2006, Dr. Basch stated as follows:

> At this point, I simply cannot explain this presentation. It is not sympathetically medicated pain as we ruled this out via differential epidural. The pain is not psychosomatic and under propofol sedation she maintained pain response. The cervical MRI was interpreted by radiologist as showing postoperative changes, minimal foraminal narrowing on left, not right. Of course, there was artifact noted from the metal.

(A.R. 585, *see* A.R. 594-98).

On February 14, 2007, Dr. Basch expressed his disagreement with the decision in plaintiff's plaintiff's worker's compensation case. (A.R. 580). I find no error.

5.     Daniel Dolanski, D.O.

Plaintiff argues that Dr. Dolanski's opinions regarding her RFC were "contradicted [by] all the other evidence in the case." (Plf. Brief at 6). Hyperbole aside, I find that there is more than substantial evidence supporting the ALJ's factual finding regarding plaintiff's RFC.[5] The ALJ generally found that Dr. Dolanski's opinions were persuasive, but his RFC finding included greater restrictions on plaintiff's use of her right arm based on Dr. Bizzigotti's opinion:

> In August 2004 the State agency consulting physician offered the opinion that the claimant was able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk (with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an 8-hour workday but allowing for periodic alternate sitting and standing, if needed, of approximately 1 to 2 minutes every hour; do no more than frequent reaching of the right upper extremity below the shoulder level and otherwise only occasional right upper extremity reaching; do no more than frequent handling with the right upper extremity; do no constant pushing and/or pulling of the lower extremities; never climb ladders, ropes and scaffolds; and occasionally climb ramps and sta[irs], balance, stoop, kneel, crouch, and crawl. She must avoid concentrated exposure to vibration concerning the right upper extremity and to workplace hazards such as moving machinery and unprotected heights (Exhibit 16F)[A.R. 386-93]. In February 2006 another State agency medical consultant made a similar residual functional capacity assessment (Exhibit 31F)[A.R. 496-503].
>
> The undersigned notes that the State agency opinion in Exhibit 16F is supported by the objective medical findings of record and the claimant's treatment and medication history. The State agency assessment provides a basis for the residual functional capacity finding of this decision. Dr. Bizzigotti, the claimant's treating orthopedist, had moreover reported that the claimant could participate in work beginning November 11, 2002. The doctor directed that the work be light duty and that the claimant do only-left handed work with no use of the right arm whatsoever until she underwent surgery (Exhibit 37F/20)[A.R. 558]. Based on Dr. Bizzigotti's additional right arm limitations in Exhibit 37F/20, the undersigned concludes that on and prior to her date last insured the claimant could do no work involving the right upper extremity and could only do left-handed work. Such a conclusion is consistent with the claimant's testimony regarding her right upper extremity limitation.

(A.R. 24). I find no basis for disturbing the Commissioner's decision.

---

[5]RFC is the most, not the least, a claimant can do despite her impairments. 20 C.F.R. § 404.1545(a)(1); *Collins v. Commissioner*, 357 F. App'x 663, 668 (6th Cir. 2009).

**Recommended Disposition**

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:  September 25, 2012          /s/  Joseph G. Scoville
                                   United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General objections do not suffice. *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).